UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :       MASTER FILE
IN RE WORLDCOM, INC. ERISA LITIGATION   :       02 Civ. 4816(DLC)
                                        :
This Document Relates to:               :
                                        :       OPINION & ORDER
ALL ACTIONS                             :
                                        :
----------------------------------------X

Appearances:

For Lead Plaintiffs:
Lynn Lincoln Sarko
Gary A. Gotto
Keller, Rohrback, LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101

Jeffrey Lewis
Lewis & Feinberg, P.C.
436 14th Street, Suite 1505
Oakland, California 94612

Edwin J. Mills
Stull, Stull & Brody
6 East 45th Street
New York, New York 10017

For Defendant Merrill Lynch Trust
Company FSB:
Paul Blankenstein
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

For Defendant Bernard J. Ebbers:
David Wertheimer
Hogan & Hartson
875 Third Ave.
New York, NY 10022

DENISE COTE, District Judge:

    This Opinion considers the petition of the named plaintiffs

in the WorldCom ERISA Litigation (the "ERISA Plaintiffs") for

approval of settlements with defendants Merrill Lynch Trust Co.

FSB ("Merrill Lynch") and Scott Sullivan ("Sullivan") in this

class action brought on behalf of employees of WorldCom, Inc. ("WorldCom") who had invested retirement funds in WorldCom stock through a WorldCom 401(k) plan ("Plan"). The Opinion also considers the adequacy of a $450,000 payment on a promissory note issued by defendant Bernard J. Ebbers ("Ebbers") pursuant to his 2004 settlement with the ERISA Plaintiffs. That settlement was approved, together with settlements with WorldCom itself,[1] several former WorldCom directors and employees, and four insurance companies who had issued fiduciary liability insurance policies to WorldCom (collectively, the "2004 Settlements"), on October 18, 2004.[2] In re WorldCom. Inc. ERISA Litig., No. 02 Civ. 4816 (DLC), 2004 WL 2338151, at *11 (S.D.N.Y. 2004) ("2004 Settlement Opinion"). Finally, this Opinion determines whether to award the remainder of the attorneys' fees requested by Lead Counsel at the time of the 2004 Settlements. For the reasons stated below, the settlements are approved, and the remainder of the attorneys' fees and costs are awarded.

## Background

The history of the WorldCom ERISA Litigation through October 18, 2004, was described in the 2004 Settlement Opinion. See

---

[1] On April 20, 2004, WorldCom emerged from bankruptcy as MCI, Inc. ("MCI").

[2] The 2004 Settlements totaled $47.15 million. See WorldCom, 2004 WL 2338151, at *2.

WorldCom, 2004 WL 2338151, at *1-*2.  That description is incorporated by reference here.

Following WorldCom's financial collapse, the ERISA Litigation was brought on behalf of participants in the Plan and certain predecessor plans of companies that merged with WorldCom for whose accounts the plans held shares of WorldCom stock at any time from "no later than" September 14, 1998 to the present.[3] Lead Plaintiffs Steven Vivien, Gail M. Grenier, and John T. Alexander; Lead Counsel, Keller Rohrback L.L.P.; and several additional Appointed Counsel[4] were selected in an Order of November 18, 2002.  On December 20, plaintiffs filed the Consolidated Class Action Complaint, and later an Amended Class Action Complaint ("Complaint").  An Opinion of June 17, 2003, granted in part a number of motions to dismiss.  In re WorldCom, Inc. ERISA Litig., 263 F. Supp. 2d 745, 772 (S.D.N.Y. 2003).  On July 25 and September 12, 2003, plaintiffs filed a second and then a third amended consolidated class action complaint, which added additional defendants and reasserted claims against certain previously dismissed defendants.

---

[3]The ERISA Plaintiffs chose this class period because they alleged that certain defendants knew or should have known by at least September 1998 that investment in WorldCom stock under the Plan was "inappropriate or imprudent."

[4]The additional Appointed Counsel were Elizabeth J. Cabraser of Lieff Cabraser and Jeffrey Lewis of Lewis & Feinberg, P.C., who were to function as Steering Committee Counsel to advise on matters such as settlement strategy.  Only Jeffrey Lewis actually functioned in this capacity.  Stull Stull and Brody operated as Local Counsel.

Fact discovery in the ERISA Litigation was coordinated with
that in the WorldCom Securities Litigation.  Document discovery
was substantially completed in the fall of 2003.  Fact discovery
in the ERISA Litigation closed on July 23, 2004.  The ERISA class
was certified under Rule 23(b)(1)(B), Fed. R. Civ. P., on October
4, 2004.  In re WorldCom, Inc. ERISA Litigation, No. 02 Civ. 4816
(DLC), 2004 WL 2211664 (S.D.N.Y. Oct. 4, 2004).  On June 30,
2004, the ERISA Plaintiffs and all of the defendants except
Merrill Lynch and Sullivan, as well as the issuers of certain
WorldCom insurance policies, executed a Settlement Agreement
that, inter alia, established a settlement fund of $47.15 million
and contained a bar order preventing the Non-Settling Defendants
from bringing claims for contribution and indemnification against
the Settling Defendants while providing the Non-Settling
Defendants a right to a reduction in the amount of any judgment
entered against them.  A fairness hearing was held on October 15,
2004.  An October 13, 2004 Opinion approved the judgment
reduction formulae and bar order, see In re WorldCom, Inc. ERISA
Litig., 339 F. Supp. 2d 561, 572 (S.D.N.Y. 2004), and the 2004
Settlement Opinion approved the settlements, see WorldCom, 2004
WL 2338151, at *11.


The Merrill Lynch Settlement

An Opinion of February 1, 2005 granted Merrill Lynch's
motion for summary judgment on all claims and denied partial
summary judgment for the ERISA Plaintiffs as moot.  In re

WorldCom, Inc. ERISA Litig., 354 F. Supp. 2d 423, 451 (S.D.N.Y.

2005) ("Summary Judgment Opinion").  Merrill Lynch had functioned

as the trustee for the Plan, which was funded by payroll

contributions from employees and matching cash contributions from

WorldCom.  Id. at 428.  The ERISA Plaintiffs alleged that,

pursuant to the Employee Retirement Income Security Act of 1974,

as amended, 29 U.S.C. § 1001 et seq. ("ERISA"), Merrill Lynch

should be liable for its failure to refuse to invest employee

funds in WorldCom stock.  WorldCom was the Plan's sponsor,

administrator, and investment fiduciary.  Id.  The Summary

Judgment Opinion found that Merrill Lynch was a directed trustee

pursuant to ERISA § 403(a), 29 U.S.C. § 1103(a), and hence had a

limited scope of responsibilities under ERISA.  It stated that

> [w]hen a directed trustee receives a direction to
> invest plan assets in the securities of a company, or
> when plan assets are already invested in such
> securities, a directed trustee has a fiduciary duty of
> inquiry under ERISA when it knows or should know of
> reliable public information that calls into serious
> question the company's short-term viability as a going
> concern.

WorldCom, 354 F. Supp. 2d at 449.  The Summary Judgment Opinion

found, however, that "plaintiffs ha[d] not shown that there

[were] questions of fact as to whether reliable public

information existed that called into serious question the short-

term viability of WorldCom as a going concern."  Id.  Merrill

Lynch was thus released from the action.

The ERISA Plaintiffs appealed the decision granting summary

judgment for Merrill Lynch to the U.S. Court of Appeals for the

Second Circuit.  Merrill Lynch had its own appeal pending before
the Second Circuit, challenging this Court's approval of the
judgment reduction formulae imposed pursuant to the 2004
Settlements.  The judgment reduction formulae are described in
WorldCom, 339 F. Supp. 2d at 564-66.

Before either appeal was argued, the ERISA Plaintiffs
reached a settlement with Merrill Lynch.  That settlement is
governed by a Stipulation and Agreement of July 5, 2005.
Pursuant to the settlement, Merrill Lynch will forgo payment, up
to a maximum of $200,000, for the services it has performed for
the Plan in connection with the 2004 Settlements and the
Securities Litigation settlements.  After the ERISA Plaintiffs
settled with Merrill Lynch, the Second Circuit stayed both
appeals, and the case was remanded to this Court for
consideration of the proposed settlement.


The Ebbers Payment

In Spring 2004, the Lead Plaintiff in the WorldCom
Securities Litigation reached a number of settlements with the
defendants in that action.  See In re WorldCom, Inc. Sec. Litig.,
No. 02 Civ. 3288 (DLC), --- F. Supp. 2d ---, 2005 WL 2293190, at
*5-*13 (S.D.N.Y. Sept. 21, 2005).  ERISA Lead Counsel
participated in the settlement negotiations between Lead Counsel
in the Securities Litigation and Ebbers, as it was clear that

Ebbers had limited assets to be divided among the parties claiming against him.[5]

Ebbers had settled with the ERISA Plaintiffs in 2004 and had contributed a cash payment of $400,000 at that time, but still owed on an unsecured promissory note (the "Note"). Under the terms of the Note, Ebbers was to make payments equal to 1% of any payments he made to satisfy his indebtedness to MCI. The total amount Ebbers was to pay to the ERISA class was at least $450,000, and up to $4 million.

The ERISA Plaintiffs reached an agreement with Ebbers pursuant to which they would accept a payment of $450,000 in satisfaction of the Note (the "Ebbers Payment"). That agreement is embodied in a Note Satisfaction Agreement of July 11, 2005. At the same time, Ebbers settled with <u>Securities Litigation</u> class for an amount that is expected to total $23.6 to $33.6 million after the sale of certain assets, and with MCI. Pursuant to these settlements and the Ebbers Payment, Ebbers forfeited substantially all of his assets, with the exception of some funds that were earmarked to pay his attorneys. See <u>WorldCom</u>, 2005 WL 2293190, at *12. The Ebbers Payment is to be distributed according to the Plan of Allocation approved for the 2004 Settlements.

---

[5]The settlement negotiations with Ebbers likewise involved the Office of the U.S. Attorney for the Southern District of New York (the "U.S. Attorney's Office"), as well as MCI, to whom Ebbers owed substantial debts. See <u>WorldCom</u>, 2005 WL 2293190, at *12.

<u>The Sullivan Settlement</u>

ERISA Lead Counsel also participated in the settlement negotiations between Lead Counsel in the <u>Securities Litigation</u> and Sullivan.[6] Pursuant to their settlement agreement with Sullivan, embodied in a Stipulation and Agreement of Settlement dated July 28, 2005, the ERISA Plaintiffs are to receive 10% of an amount that includes the proceeds of the sale of Sullivan's house in Florida, net of certain fees and expenses, and 10% of the balance of Sullivan's MCI 401(k) plan (the "Sullivan Settlement"). It is estimated that these payments will total approximately $485,000. Pursuant to the <u>Securities Litigation</u> and <u>ERISA Litigation</u> settlements, Sullivan forfeited substantially all of his assets. See <u>WorldCom</u>, 2005 WL 2293190, at *12. The proceeds of the Sullivan Settlement are to be distributed according to the Plan of Allocation approved for the 2004 Settlements.

<u>Notice to the Class</u>

The class was informed of the terms of the Merrill Lynch and Sullivan Settlements and the Ebbers Payment (collectively, the "2005 Settlements") in a Notice of Pending Class Action Settlement of Remaining ERISA Claims and Settlement Fairness

_____

[6]The settlement negotiations with Sullivan also involved representatives from the U.S. Attorney's Office, which had prosecuted the criminal case against Sullivan. See <u>WorldCom</u>, 2005 WL 2293190, at *12-*13.

Hearing (the "Settlement Notice"), the mailing of which commenced on September 2, 2005.  A representative of Poorman-Douglas Corporation, the claims administrator for the litigation, attests that a total of 88,720 Settlement Notices were mailed.  In addition, notice of the 2005 Settlements appeared in the <u>Wall Street Journal</u> on August 6, 2004.

The Settlement Notice was directed to "Any person who was a participant in the WorldCom 401(k) Salary Savings Plan or one of its predecessor 401(k) plans at any time from September 14, 1998, to the present."  It described the basis for the claims in the <u>ERISA Litigation</u>; set forth the terms of the Merrill Lynch and Sullivan Settlements and the Ebbers Payment; informed class members that a fairness hearing was scheduled for November 18, 2005; and set a deadline of October 17, 2005 for filing objections.  The Settlement Notice also informed class members that the Court had reserved 20% of the cash component of the 2004 Settlements for potential distribution to counsel.  It noted that $5 million of that amount had already been awarded to Lead Counsel and Appointed Counsel, and stated that pursuant to the 2005 Settlements Lead Counsel would request the remainder of the 20% set-aside and reimbursement for further expenses, but that it sought no additional fees.

<u>The Fairness Hearing</u>

A fairness hearing was held on November 18, 2005.  Lead Counsel and counsel for Merrill Lynch and Ebbers were present, as

was one of the named plaintiffs in the litigation.  No member of
the class appeared to object to the 2005 Settlements or the
request for an award of attorneys' fees.  The Court indicated to
counsel at the hearing that the 2005 Settlements would be
approved and that Lead Counsel would receive the attorneys' fees
it had requested.

## Approval of the 2005 Settlements

Rule 23(e), Fed. R. Civ. P., provides that a class action
may not be settled without the approval of the district court.
D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001).  "A
court may approve a class action settlement if it is fair,
adequate, and reasonable, and not a product of collusion."  Wal-
Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir.
2005) (citation omitted).  A district court determines the
fairness of a settlement "by examining the negotiating process
leading up to the settlement as well as the settlement's
substantive terms."  D'Amato, 236 F.3d at 85.  A court must
ensure that the settlement resulted from "arm's-length
negotiations" and that plaintiffs' counsel engaged in the
discovery "necessary to effective representation of the class's
interests."  Id.

In evaluating the substantive fairness of a settlement, a
district court must consider factors enumerated in City of
Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974):

(1) the complexity, expense and likely duration of the
litigation, (2) the reaction of the class to the
settlement, (3) the stage of the proceedings and the
amount of discovery completed, (4) the risks of
establishing liability, (5) the risks of establishing
damages, (6) the risks of maintaining the class action
through the trial, (7) the ability of the defendants to
withstand a greater judgment, (8) the range of
reasonableness of the settlement fund in light of the
best possible recovery, [and] (9) the range of
reasonableness of the settlement fund to a possible
recovery in light of all the attendant risks of
litigation.

D'Amato, 236 F.3d at 86 (citation omitted).  Finally, there is a

"strong judicial policy in favor of settlements, particularly in

the class action context."  Visa, 396 F.3d at 116.

There is no suggestion that the settlements were tainted by

collusion or were achieved by any means other than arm's-length

negotiations between adversaries.  Moreover, the Grinnell factors

strongly favor approval of the 2005 Settlements.  Although there

are approximately 80,000 class members, none has objected to the

2005 Settlements[7] -- a fact which itself demonstrates the

reasonableness of the settlements.  The settlements were achieved

post-discovery, and after the summary judgment motion of the sole

remaining "deep-pocket" defendant had been decided in that

_____

[7]Robin Richter argues that she should be allowed to
participate in the recovery.  She is not a class member, however,
because she rolled over her 401(k) to a private account at a
brokerage many years before the Class Period.  Three additional
objections, by class members George Auger, Robert R. Cooper,
Stephen Sawyer, and Joseph Serafin, were withdrawn prior to the
fairness hearing.

defendant's favor.  The parties were thus well-aware of the risks that inhered in continuing to litigate.

Pressing their appeal from the Merrill Lynch summary judgment decision, and defending Merrill Lynch's appeal of the decision regarding the judgment reduction formulae, would have been a risky strategy for the ERISA Plaintiffs.  By settling with Merrill Lynch and staying the appeals, the ERISA Plaintiffs effectively obtained some recovery for class members –- by eliminating the need to pay Merrill Lynch up to $200,000 in fees from the pool of money available to class members -- even though, if the summary judgment appeal were unsuccessful, Merrill Lynch would have no liability to the class and would be under no obligation to forego the fees it had earned.  Further, the ERISA Plaintiffs did not have reason to be optimistic about their chances of success on appeal.  The ERISA claims against Merrill Lynch were fairly novel at the commencement of the WorldCom ERISA Litigation, but the legal landscape has since shifted.  A recent interpretive bulletin issued by the U.S. Department of Labor emphasized the "significantly limited" duties of a directed trustee to determine the prudence of a particular investment.  U.S. Dep't of Labor, In the Context of Publicly Traded Securities, What Are the Fiduciary Responsibilities of a Directed Trustee?, Field Assistance Bulletin 2004-03 (Dec. 17, 2004)) ("Field Assistance Bulletin").  That bulletin was considered in

the Summary Judgment Opinion.  See WorldCom, 354 F. Supp. 2d at
444.  In addition, the ERISA Plaintiffs note that recent district
court decisions have agreed with Summary Judgment Opinion's
assessment of the law, see, e.g., DiFelice v. U.S. Airways, Inc.,
--- F. Supp. 2d ---, 2005 WL 2386227 (E.D. Pa. Sept. 27, 2005);
Summers v. UAL Corp. ESOP Comm., 2005 WL 2648670 (N.D. Ill. Oct
12, 2005), a further indication that the current state of the law
does not favor the ERISA Plaintiffs' claims against Merrill
Lynch.

In addition, even if this Court's summary judgment decision
had been overturned, if Merrill Lynch's appeal of the judgment
reduction formulae decision were successful, Merrill Lynch's
ultimate liability at trial might have been greatly reduced.[8]
Further litigation with Merrill Lynch would have increased the
lodestar, which is an unenhanced attorneys' fees calculation,
threatening a further diminution of the amount of recovery
available for class distribution.  The Merrill Lynch Settlement
was thus based on a rational assessment of the risks of further
litigation.  Given the unfavorable disposition of the litigation
to the class at the time the Merrill Lynch Settlement was
reached, the modest amount of that settlement is reasonable.

_____

[8]The effect of the judgment reduction formulae on Merrill
Lynch's potential liability at trial is explained in WorldCom,
339 F. Supp. 2d at 570.

Finally, the settlement with Merrill Lynch permits distribution of the recovery obtained in the 2004 Settlements. So long as Merrill Lynch's appeal of the decision regarding the judgment reduction formulae was pending, the proceeds from the 2004 Settlements were held hostage.

The Sullivan Settlement is likewise entirely reasonable, given the practical obstacles the ERISA Plaintiffs faced in achieving any recovery from Sullivan. Regardless of whether the class would likely have obtained a jury verdict against Sullivan, it is clear that Sullivan possessed very limited resources with which to pay any judgment. Coordinating with the Lead Plaintiff in the Securities Litigation to assure that the ERISA class received an equitable proportion of Sullivan's assets was a perfectly prudent decision on the part of ERISA Plaintiffs. As noted in the Declaration of Lynn Lincoln Sarko, the 1:9 ratio of the distribution between the ERISA class and the Securities Litigation class is explained by the difference in the size of the two classes.[9] In addition, the Plan is itself a member of the Securities Litigation class and has filed a claim, entitling Plan participants to recovery in the securities class action as well.

---

[9] The Securities Litigation was brought on behalf of approximately four million potential class members, more than 830,000 of whom submitted proofs of claim. WorldCom, 2005 WL 2293190, at *15. As noted above, the ERISA Litigation class numbers approximately 80,000.

14

The ERISA Plaintiffs' acceptance of the Ebbers Payment in satisfaction of the outstanding Note is similarly reasonable, given the competing claims on Ebbers' assets. The Ebbers Payment provides the minimum payment specified in the Note, the terms of which were approved with the 2004 Settlements. See WorldCom, 2004 WL 2338151, at *8. It would be virtually impossible for the class to receive anything more from Ebbers, since Ebbers is only obligated under the Note to pay the Plan 1% of what he pays MCI, and he has no ability to pay MCI close to $45 million.

Together with the 2005 Settlements, the class stands to recover $49 million, less attorneys' fees and expenses,[10] on estimated losses ranging from $150 million to $600 million. See WorldCom, 2004 WL 2338151, at *6. The 2005 Settlements are reasonable in light of the formidable hurdles that the ERISA Plaintiffs would have had to surmount to achieve any greater recovery for the class from the defendants involved.

## Attorneys' Fees and Expenses

Pursuant to the 2004 Settlements, Appointed Counsel were awarded $5 million in attorneys' fees[11] and reimbursement for

---

[10]In addition, the class stands to recover approximately $0.54 per share from the settlements in the WorldCom Securities Litigation.

[11]At that time, the lodestar for Appointed Counsel was $5.99 million.

$895,570.64 in expenses and $80,327.47 in notice costs.[12]  The fee award represented only a portion of the $8,487,000 in attorneys' fees requested by Appointed Counsel.  The 2004 Settlement Opinion set aside 20% of the cash settlement fund for potential distribution to counsel and invited Lead Counsel to apply for additional attorneys' fees at the conclusion of the proceedings against Merrill Lynch, see WorldCom, 2004 WL 2338151, at *11-*12, the only remaining defendant from whom a significant recovery could be achieved.

Pursuant to the 2005 Settlements, Lead Counsel requests the remainder of the 20% that was set aside for Appointed Counsel pursuant to the 2004 Settlements.  The outstanding amount is $4,586,088, for a total of $9,586,088 in fees.[13]  Lead Counsel attests that a total of 22,324 post-appointment hours were spent by it and the other Appointed Counsel on the case, of which 21,139 were billed by Keller Rohrback.  Lead Counsel calculates the lodestar fee for all post-appointment work by Appointed Counsel as $7,549,481.[14]  The requested amount represents a lodestar multiple of 1.3.  Lead Counsel represents that it will

_____

[12]Lead Counsel was also authorized to maintain a fund of $50,000 to pay future notice costs.

[13]This $9,586,088 figure represents 20% of the fund from the 2004 Settlements, plus accrued interest.  It does not include any amount from the 2005 Settlements.

[14]The work done in 2005 has been calculated using 2004 rates.

pay the fees previously awarded to Vivien Counsel and Emanuele Counsel, see id. at *11-*12, for their pre-appointment work from this award.  An award of $100,000 and reimbursement of expenses for approximately three months has been approved for Vivien Counsel, In re WorldCom, Inc. ERISA Litig., NO. 02 Civ. 4816 (DLC), 2004 WL 2579630, at *2 (S.D.N.Y. Nov. 15, 2004), and $75,000 plus expenses incurred during a ten-day period will go to Emanuele Counsel, In re WorldCom, Inc. ERISA Litig., NO. 02 Civ. 4816 (DLC), 2004 WL 2579631, at *2 (S.D.N.Y. Nov. 15, 2004).

Appointed Counsel also request reimbursement of post-appointment expenses totaling $1,206,812.66.[15]  They ask that this award be made in addition to the award of attorneys' fees, which will result in a net recovery to the class of $38,282,487.15, or 78% of the settlement fund (net of taxes).

When attorneys create a common fund from which members of a class are compensated for a common injury, they are entitled to "a reasonable fee -- set by the court -- to be taken from the fund." Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 47 (2d Cir. 2000) (citation omitted).  Determination of "reasonableness" is within the discretion of the district court. Id. at 47.  There are two methods by which the court may calculate reasonable attorneys' fees in a class action, the

---

[15]$311,242.02 of this amount has been incurred since the date that the 2004 Settlements were approved.

lodestar method and the percentage method.  Applying either method, the court should consider the following factors, known as the <u>Goldberger</u> factors: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.  <u>Visa</u>, 396 F.3d at 121 (citing <u>Goldberger</u>, 209 F.3d at 50).

The lodestar method "calculates attorneys' fees by multiplying hours reasonably expended against a reasonable hourly rate."  <u>Id.</u> at 123 n.27.  The court may determine that an enhancement of the lodestar is warranted "based on factors such as the riskiness of the litigation and the quality of attorneys." <u>Id.</u>

Under the percentage method, the fee award is simply "some percentage of the fund created for the benefit of the class." <u>Savoie v. Merchants Bank</u>, 166 F.3d 456, 460 (2d Cir. 1999).  "The trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation."  <u>Visa</u>, 396 F.3d at 121 (citation omitted).  This method has been found to be a solution to various problems inherent in the lodestar method, which "creates an unanticipated disincentive to early settlements, tempts lawyers

to run up their hours, and compels district courts to engage in a gimlet-eyed review of line-item fee audits." Id. Where the lodestar fee is used as "a mere cross-check" to the percentage method of determining reasonable attorneys' fees, "the hours documented by counsel need not be exhaustively scrutinized by the district court." Goldberger, 209 F.3d at 50.

Perhaps the most significant issue to address in connection with this fee request is whether the ERISA Plaintiffs should have pursued their claims against Merrill Lynch. The ERISA Plaintiffs proceeded on two theories against Merrill Lynch, only one of which survived a motion to dismiss. WorldCom, 263 F. Supp. 2d at 761-63. The remaining theory, that Merrill Lynch breached its fiduciary duty as a trustee, did not survive summary judgment. WorldCom, 354 F. Supp. 2d at 451. Some significant percentage of the cost of litigating the class claims was incurred in pursuing Merrill Lynch, the only deep pocket. If the claims against Merrill Lynch were either frivolous or destined to fail, then at the very least, these fees should be excluded from the lodestar calculation.

Lead Counsel argues that it could not "in good faith" have abandoned a suit against Merrill Lunch. It had understood that Merrill Lynch was "a very involved" trustee, but represents that discovery showed that there was no basis to find that Merrill Lynch had either knowledge of WorldCom's accounting misconduct or

any authority to make decisions about whether to include WorldCom stock as an investment option for the plan participants. Moreover, Lead Counsel emphasizes that this class of litigation -- which it describes as ERISA company stock cases -- is in its infancy, and that it was only after fact discovery had closed and the summary judgment motion had been briefed that the Field Assistance Bulletin was issued. That bulletin dramatically altered the legal landscape and destroyed any chance that the class claims would be permitted to proceed to trial.

On balance, it appears that the decision to pursue ERISA claims against Merrill Lynch was aggressive and without a realistic likelihood of success. It cannot be said, however, that the claims were frivolous when first filed. Given the enormity of the loss suffered by the class, and the likelihood that the class recovery would be modest without a contribution from Merrill Lynch, it was not unreasonable for the ERISA Plaintiffs to pursue such claims, at least so long as this area of the law remained unsettled.

With that significant issue addressed, it is appropriate to repeat the observations made at the time the 2004 Settlements were approved:

> Lead Counsel is clearly entitled to a substantial legal fee for the work it has performed up to this point in the ERISA Litigation. Lead Counsel has performed an important public service in this action and has done so efficiently and with integrity. It has cooperated completely and in novel ways with Lead

> Counsel for the <u>Securities Litigation</u>, and in doing so
> all of them have worked to reduce legal expenses and
> maximize recovery for class members. . . . Lead Counsel
> should be appropriately rewarded as an incentive for
> the further protection of employees and their pension
> plans not only in this litigation but in all ERISA
> actions.

<u>WorldCom</u>, 2004 WL 2338151, at *10.

In essence, Lead Counsel seeks $2 million on top of its lodestar, from which it will compensate Appointed Counsel and those attorneys to whom this Court has made an award for their pre-appointment work in the ERISA actions which have been consolidated in this case. While the modest recovery achieved for the class counsels strongly in favor of returning as much of the recovery as possible to the class, an award of 20% in attorneys' fees is entirely reasonable.

Conclusion

The ERISA Plaintiffs' petition for approval of the Merrill Lynch and Sullivan Settlements and the Ebbers Payment is granted. Lead Counsel's petition for attorneys fees, expenses, and notice costs is granted. All claims in this litigation having been settled, the Clerk of Court shall close the case.

SO ORDERED:
Dated:    New York, New York
          November 21, 2005

                              _____
                              DENISE COTE
                              United States District Judge

21